IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SHANNON D. MATTINGLY, | ) | CASE NO.  1:22-CV-00449-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| vs. | ) | JONATHAN D. GREENBERG |
| | ) | |
| KILOLO KIJAKAZI | ) | |
| ACTING COMMISSIONER OF | ) | **MEMORANDUM OF** |
| SOCIAL SECURITY, | ) | **OPINION AND ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Shannon D. Mattingly ("Plaintiff" or "Mattingly"), challenges the final decision of

Defendant, Kilolo Kijakazi, Acting Commissioner of Social Security ("Commissioner"), denying her

applications for Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI")

under Titles II and XVI of the Social Security Act ("SSA"),42 U.S.C. §§ 416(i), 423, and 1381 *et seq.*

("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties,

pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is

**AFFIRMED.**

### PROCEDURAL HISTORY

In December 2017, Mattingly filed an application for DIB under Title II of the SSA.  (Transcript

("Tr.") at 297)  Mattingly also protectively filed a Title XVI application for SSI on August 27, 2018.

(Tr. 299)  In both applications, Mattingly alleged a disability onset date of April 20, 2016, and claimed

she was disabled due to migraines, degenerative disc disease ("DDD")/spondylosis, anxiety, carpal

tunnel, depression, and vertigo.  (Tr. 86)  Mattingly's applications were denied initially and upon

reconsideration, and Mattingly requested a hearing before an administrative law judge

1

("ALJ"). (Tr. 183, 192, 203, 206).

On February 2, 2021, ALJ Deborah M. Giesen held a telephonic hearing, during which Mattingly, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 50-84). On February 25, 2021, the ALJ issued a written decision finding Plaintiff was not disabled. (Tr. 17-43). The ALJ' s decision became final on January 27, 2022, when the Appeals Council declined further review. (Tr. 1-6)

On March 22, 2022, Mattingly filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 6, 9, 10). Mattingly asserts the following assignment of error:

(1) The decision is unsupported by substantial evidence as the ALJ failed to properly evaluate the opinion evidence.

(Doc. No. 6)

## EVIDENCE

### A. Personal and Vocational Evidence

Mattingly was born in June 1970 and was forty-five years-old at the time of her alleged onset date, making her a "younger" individual age 18-49 under social security regulations. (Tr. 42, 297) *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c). She has a high school education and is able to communicate in English. (Id.) Mattingly reported past work as a cashier and clerk (Tr. 383-84.)

### B. Relevant Medical Evidence[1]

#### 1. Mental Impairments – Treatment Notes

---

[1] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

From July 2016 to May 2017, Mattingly attended mental health counseling with Appleseed Community Mental Health Center for depression and anxiety. (Tr. 626-54, 923-84).  In August 2016, Mattingly presented as tearful, expressed suicidal ideation, and stated she was overwhelmed due to constant pain, joblessness, and homelessness.  (Tr. 647)  The next month Mattingly reported she had several opportunities for employment and was trying to decide based on hours and physical labor. (Tr. 642)  Throughout her counseling appointments in 2016 and 2017 Mattingly often reported that she was doing well, enjoyed her job, and enjoyed her relationship with her co-workers.  (Tr. 944, 948-49, 961 965)  During this period, Mattingly also reported feel depressed, struggles with her personal relationships, and stress due to her health conditions and living situation.  (Tr. 944-45, 950. 970)  When Mattingly lasted attending counseling with Appleseed in May 2017, it was reported that her outlook was improved "as she was able to secure a vehicle and she likes her job very much."  (Tr. 942)  In July 2017, Mattingly was discharged for not returning to treatment.  (Tr. 924)  It was reported at that time that Mattingly showed intelligence and insight during treatment, was responsive to treatment, but was inconsistent with showing up for appointments. (Tr. 924)  There are no records of mental health treatment between mid-2017 and mid-2019.

On September 9, 2019, Mattingly underwent a crisis assessment at Joel Pomerene Hospital emergency room after reports she barricaded herself in her room with a gun and made threats to harm herself. T 843-859, 880-918, 922.  Mattingly denied suicidal or homicidal ideation and stated that she was crying in the room after an argument with her mother and forgot she had an unloaded gun in the room.  (Tr. 843) She was diagnosed with an adjustment disorder and discharged.  (Tr. 848-50) On September 30, 2019, Mattingly received mental health services at the Counseling Center of Wayne and Holmes Counties. (Tr. 830-842)  She had been referred after an inpatient state at Northcoast Behavioral Health. (Tr. 836)  However, Mattingly states there was "no reason" for her admission and that  her mother and son had called the police on her and lied about her threatening to hurt herself and her family.  (Tr. 830, 836)  Mattingly's mood, speech, cognitive function, and behavior were reported as unremarkable.  (Tr. 834)  Her thought content was preoccupied and phobic.  (Id.)

3

On October 14, 2019, Mattingly treated with Nicole Hopton, LPC.  (Tr. 860)  Mattingly reported masking her emotions with laughter and avoiding emotional triggers.  (Id.)  She also stated everything had been "fine" and she missed appointments due to lack of transportation.  (Id.)  The counselor stated that Mattingly engaged in meaningful conversation.  (Id.)

### 2. Mental Impairments – Medical Opinions

*James Sunbury, PhD – November 2016*

Dr. Sunbury opined that Mattingly had no current mental health limitations, but stated past abusive relationships caused anxiety and depression which interfered with her work (Tr. 656-60).

*Curt Ickes, PhD – November 2018*

In his consultative examination report Dr. Ickes opined that Mattingly could understand, carry out, and remember one-step and complex instructions; would be able to effectively interact with others in small group settings, but would be more anxious in a job requiring ongoing interactions with the public; could perform low-stress work activities and routine tasks; and that fast-paced or changing tasks may increase her anxiety (Tr. 780).

*Kenneth Gruenfeld, PhD – April 2019*

Dr. Gruenfeld opined that Mattingly would: (a) struggle with understanding, remembering or applying information due to severity of mental health issues, presentation, untreated conditions; (b) have difficulty interacting with others; (c) work slower due to problems with focus and motivation and have difficulty with multi-step job tasks or multitasking; (d) suffer from increased stress and resulting performance issues due to mental health issues.  (Tr. 803-04)

### 3. Physical Impairments – Treatment Notes

Between March 2016 and June 2017, Mattingly treated with Melinda June Harpster, CNP. (Tr. 424-438, 612-624, 665-700, 1070-1098).  At the first visit with Nurse Harpster, Mattingly complained of chronic neck pain, shoulder stinging, hand numbness, and dizziness.  (Tr. 424) On examination,

4

Mattingly had normal range of motion, strength, and gait.  (Tr. 428)  She also exhibited some cervical and lumbar tenderness.  (Id.)  In July 2016, Mattingly wore a neck brace and told Harpster that she fell and hit her head.  (Tr. 612)

In April 2016, Mattingly saw neurosurgeon Dr. Richard Rhiew due to neck pain and numbness in both upper extremities.  (Tr. 593-97)  An examination revealed (a) limited cervical spine range of motion with normal flexion, extension, lateral tilt, and turn, as well as pain with turning and tilting of neck; (b) normal gait, station, and strength.  (Tr. 595)  Mattingly reported that she had no improvement with prior at-home conservative care.  (Id.)  Dr. Rhiew recommend an MRI and steroid injections, Mattingly declined the steroid injections.  (Id.)

In 2017 and 2018, Mattingly presented to Fairview Hospital.  (Tr. 709-17, 728-30).  On March 31, 2017, Mattingly treated with Dr. Jeremy Amps.  (Tr. 714-17)  On examination, Mattingly had severe pain to light palpation of cervical spine and right cervical paraspinals, as well as diminished sensation throughout her left hand.  (Id.)  She also had normal motor strength, muscle tone, and gait.  (Id.)  On April 26, 2017, Mattingly complained of trembling, vertigo, migraines, and neck pain.  (Tr. 710)  Upon examination, Mattingly reported decreased facial sensation.  (Tr. 712)  The exam also revealed normal motor strength. (Id.)  Dr. Amps gave the option to start medication or be admitted for a formal diagnosis.  (Id.)  Mattingly chose to start medication (Depakote).  (Id.)

In February 2018, Mattingly returned to Dr. Rhiew complaining of neck pain, numbness, tingling and a burning cold feeling of pins and needles down left arm.  (Tr. 730)  Dr. Rhiew suggested further testing and recommended pain management and physical therapy.  (Id.)

In March and April 2018, Mattingly engaged in physical therapy ("PT") with David A. Veley, P.T., D.P.T. (Tr. 736-64, 980-1008)  In April 2018,  Mattingly said she felt like her head was going to "fall off," she also reported headaches and vomiting after a session.  (Tr. 737)  That month, although Veley reported

5

Mattingly experienced good progress with PT, Mattingly discontinued treatment stating she wanted to hold off until she saw a spine specialist in late April 2018.  (Tr. 741)

On May 26, 2020, Mattingly treated with Martin Taylor, D.O., PhD.  (Tr. 1324-25)  Mattingly complained of neck pain, reduced range of motion, and migraine.  (Id.)  An examination revealed "pain disproportionate to light touch on palpitation of the upper cervical paraspinals."  (Id.)  The examination also found full strength, intact sensation and coordination, and a normal gait.  (Id.)  Dr. Taylor recommended spinal injections and an MRI.  (Id.)

On July 6, 2020, Mattingly treated with Jayesh Vallabh, M.D. (Tr. 1357-61)  She complained of radiating neck pain numbness and weakness in hands and upper extremities.  (Tr. 1357)  Dr. Vallabh noted that Mattingly completed six weeks of PT in 2018 which was reportedly "very helpful."  (Tr. 1358)  On examination, Mattingly showed tenderness to palpitation of the cervical paraspinal muscles and pain limited flexion, extension, rotation, and bending.  (Id.)  Other testing revealed normal results including full upper extremity strength, normal sensation, normal gait. (Id.)  For her neck pain, Dr. Vallabh referred Mattingly for PT, suggested a topical medication, and recommended Mattingly continue to perform normal activities of daily living and avoid prolonged rest.  (Tr. 1361)  Dr. Vallabh also recommended further diagnostic testing.  (Id.)

Dr. Vallabh also referred Mattingly to receive a consult with neurologist John G. Oas, M.D., which took place on September 23, 2020.  (Tr. 1333-1340)   Mattingly was able to complete spinal movements without restriction, had intact sensation in all limbs, and normal strength.  (Tr. 1338-39) Her gait was unsteady without veer and she complete heel-knee-shin tests with no ataxia.  (Id.)  Dr. Oas recommend Mattingly receive PT for her dizziness.  (Tr. 1334)

*Diagnostic Testing*

- March 2016 cervical spine x-ray – showed marked degenerative disc diseases ("DDD") at C5-C6 with encroachment on the intervertebral neural foramina bilaterally, secondary to hypertrophy. There was also mild spondylolisthesis at C4-C5 in the neutral position with change in the position of the C4 vertebra slightly on flexion and extension (Tr. 432).

- May 2016 cervical MRI - showed posterior discovertebral complex at C5-C6 resulting in mild-moderate stenosis with slight flattening of the anterior aspect of the spinal cord.  There was also mild left and mild-moderate right foraminal stenosis. At C6-C7, there was a small right paracentral posterior disc protrusion (Tr. 580-81).

- March 2018 cervical MRI- revealed DDD secondary endplate degenerative spurring, disc bulging with broad effacement of ventral subarachnoid space C4-C5, consistent with mild to moderate central canal stenosis; additional degenerative changes of the uncinate processes bilaterally result in moderate to severe right and moderate left foraminal stenosis; disc bulging with low level left recess focused protrusion at C6-C7; and at least mild narrowing of the left recess position.  No formal stenosis or cord compression. (Tr. 977-78)

- June 2019 cervical MRI - showed desiccated broad central C5-C6 disc herniation indenting the anterior aspect of thecal sac; desiccated broad central C6-7disc herniation indenting the anterior aspect of thecal sac; and uncovertebral osteophytes producing severe bilateral C5-6 and moderate bilateral C6-7 foramina. (Tr. 1326)

- A May 2020 cervical MRI - showed disc herniations at C5-C6 and C6-C7. There were osteophytes producing severe bilateral C5-C6 and moderate bilateral C6-C7 stenosis. (Tr. 1342). Finally, a July 2020 nerve conduction study (NCS) and electromyogram (EMG) were within normal limits.  (Tr. 1346)

- On July 15, 2020, Plaintiff received an x-ray of the cervical spine, revealing multilevel degenerative disc disease, reflecting disc space narrowing and endplate osteophytes at C5-6 and C6-, mild neural foraminal encroachment at C5-6 and C6-7 on the right, minimally at C6-7 on the left. (Tr. 1354)

**4.  Physical Impairments – Medical Opinions**

*CNP Melinda Harpster – March 2016*

Harpster opined Mattingly could return to work with a lifting restriction (10lbs or less) and accommodation to keep her neck in a neutral position.(Tr. 43)

*James Gatton, M.D. – December 2018*

Dr. Gatton opined that Mattingly could stand and walk 3-4 hours in an 8-hour workday; carry less than 5 pounds frequently and more than 10 pounds occasionally; and would have "other limitations in functioning including lifting, carrying, pushing, pulling, and overhead and forward reaching. Fine motor skills, such as gripping, are diminished on the left."  (Tr. 789)

*Christopher Thomas, D.O. – April 201*

7

Consultative examiner, Dr. Christopher Thomas, opined that Mattingly could stand and walk for 2 out of 8 hours in a workday; could carry less than 10 pounds frequently, and more than 10 pounds occasionally; and is limited in carrying, pushing, and pulling, crawling, kneeling and crouching, overhead and forward reaching, as well as climbing, stooping, and bending. (Tr. 798).

## C.  Hearing Testimony

During the February 2, 2021, hearing, Mattingly testified to the following:

- **Work History:**  Mattingly testified she worked from 2005-2010 as a clerk/cashier for Mac's Convenience Store, a job that required standing most of the day, ringing out customers, training other employees, and carrying up to 40 pounds.  (Tr. 59-60)  From 2011 to 2015 or 2016 Mattingly worked as a utility clerk for Buehler Food Markets, where she unloaded pallets, stocked a grocery store, and lifted up to 75 pounds.  (Tr. 60-62)  Mattingly stated that she left the Buehler job due to severe neck and hand pain. (Tr. 61-62)  Mattingly later worked a part-time job for Sub Maker Sub Shop for six months, leaving the sub shop job because she moved.  (Tr. 62)  Mattingly also worked part-time for 4 weeks in 2018 at Mac's Food Center. (Id.)

- **Impairments:**  Mattingly testified that she was unable to work due to neck issues, vertigo, dizziness, severe nausea, severe migraines, and severe depression.  (Tr. 66, 69)  Mattingly stated that she falls down at times when she loses feeling in her legs/feet and gets dizzy when moving too fast. (Id.)  She also reported wearing a cervical neck collar 10 hours a day and using a cane. (Id.)

- **Treatment:**  Mattingly testified that she participated in physical therapy for fibromyalgia and arthritis in 2018 but not since that time.  (Tr. 67)  Mattingly stated that at time of the hearing she was not seeing a neurologist or taking medication other than the occasional ibuprofen (Tr. 70)  Mattingly stated that she was not taking medication or engaging in counseling for her mental health impairments.  (Tr. 70-71)

- **Daily Living:**  Mattingly stated that she lived with a friend, who drove her place because she lost her license in 2018 for driving without insurance.  (Tr. 65-66)  Mattingly used marijuana and methamphetamines in the past but testified she had not used either since 2018.  (Tr. 72)  Mattingly stated that she listened to audiobooks on her phone and texted friends and family.  (Tr. 73)  She further stated that she had virtual visits with her children and grandchildren due to COVID.  (Tr. 73-74)

- **Attorney Examination:**  In response to questions from her attorney, Mattingly testified she wore the neck brace every day; had difficulty writing, opening buttons and jars, and using utensils; got dizzy if she looked own for more than five seconds, and could not move her head without moving her whole body.  (Tr. 75-76)

8

VE, Heather Smith, also testified at the hearing.  (Tr. 76-83). The ALJ posed three hypothetical scenarios to the VE about whether a hypothetical individual of Mattingly's age and education could work and, if so, what types of jobs could they perform with the following theoretical limitations:

1.  Light work; no climbing ladders, ropes, or scaffolds; no unprotected heights, open flames, or unprotected dangerous moving machinery; occasional climbing ramps and stairs; frequent overhead reaching; performance of simple, routine tasks involving simple work-related decisions not requiring a fast production-rate pace or strict production quotas; occasional co-worker interaction but no public interaction.
    - The VE testified that the hypothetical person could not perform Mattingly's past work but could perform work as an inspector and hand packager; a small product assembler; or a mail clerk. (Tr. 79-80)

2.  The ALJ then added to hypothetical #1 that the individual could frequently handle with the left non-dominant hand.
    - The VE testified that the additional limitation would not impact the three jobs provided in hypothetical #1.  (Tr. 80)

3.  The ALJ then started again with hypothetical #1 and added a limitation that the individual could only on occasion handle and finger with the non-dominant hand.
    - The VE testified that the inspector/hand packager, small products assembler, and mail clerk jobs would no longer be available and that there would be no jobs available at the light level for hypothetical #3.  (Tr. 81)

4.  The ALJ then started with hypothetical individual #2 and asked if adding only occasional neck movement and flexion-extension rotation would impact the ability to perform work.
    - The VE testified no jobs would be available.  (Tr. 82)

In response to the ALJ's questioning, the VE also testified that in competitive employment employees may be off task no more than 10% of the day and that most employers will tolerate one to two absences in a month (not on a consistent basis).  (Tr. 82)  Mattingly's counsel had no questions for the VE.  (Tr. 83)

## STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any

medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).  A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31. 2022.

2.   The claimant has not engaged in substantial gainful activity since April 20, 2016, the alleged onset date (20 CFR 416.971 *et seq*. and 416.971 *et seq.*).

3.   The claimant has the following severe impairments:  cervical spine degenerative disc disease; vertigo; depressive disorder; anxiety disorder/panic disorder (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except no climbing ladders, ropes, or scaffolds; no work around unprotected heights, open flames, or unprotected dangerous moving machinery; occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; frequent reaching overhead; simple, routine tasks, involving simple work-related decisions; not requiring a fast production rate pace or strict production quotas; occasional interaction with coworkers, and no interaction with the public.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on June 6, 1970, and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82041 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

10.    The claimant has not been under a disability, as defined in the Social Security Act, from April 20, 2016, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 17-43)

## STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v.Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so

because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v.Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v.Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## ANALYSIS

**A.    Mattingly fails to show that the ALJ's decision is unsupported by substantial evidence or lacks an accurate and logical bridge**

Mattingly presents only one issue for this court's review.  Mattingly asserts that the ALJ's decision is unsupported by substantial evidence as the ALJ failed to properly evaluate the opinion evidence.  (Doc. No. 6 at 8-27)   In particular, Mattingly contends that the ALJ failed to properly evaluate the opinions of Dr. Gruenfeld, Dr. Thomas, Dr. Gatton, and N.P. Harpster in accordance with

regulatory standards.  (Doc. No. 10 at 2)  The Commissioner counters that the ALJ's consideration of the medical source opinions was procedurally proper and is supported by substantial evidence.  (Tr. 16-25)

### 1.  Standard of Review

In January 2017, the Social Security Administration ("SSA") amended the rules for evaluating medical opinions for claims filed after March 27, 2017. *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, (Jan. 18, 2017). The new regulations, which apply to Mattingly, provide that the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." 20 C.F.R. § 404.1520c(a).  Accordingly, the new regulations eliminate any semblance of a hierarchy of medical opinions.  *See* 20 C.F.R. § 404.1520c(a). They also eliminate the agency's "treating source rule," which gave special deference to certain opinions from treating sources. 82 Fed. Reg. 5844 at 5853.  The new regulations require an ALJ to "articulate how he considered the medical opinions and prior administrative medical findings" in adjudicating a claim by explaining how he considered the factors of supportability and consistency, which are the two most important factors in determining the persuasiveness of a medical opinion or prior administrative medical finding. 20 C.F.R. § 404.1520c(b)(2).  The ALJ generally is not required to explain how he considered other factors. *Id.* (emphasis added); 20 C.F.R. § 404.1520c(b)(3).

As Mattingly's brief acknowledges, "[t]he Commissioner's conclusion will be affirmed absent a determination that the ALJ failed to apply the correct legal standard or made fact findings unsupported by substantial evidence in the record." *Kimberly P., v. Commissioner of Social Security*, No. 3:20-CV-227, 2022 WL 1100936, at *1 (S.D. Ohio Apr. 13, 2022).

### 2.  Dr. Gruenfeld's Opinion

In April 2019, Dr. Kenneth Gruenfeld evaluated Mattingly regarding her mental health limitations and opined that  Mattingly would: (a) struggle to understand, remember, or apply

14

information due to severity of her mental health issues, her presentation, and untreated conditions; (b) experience difficulty interacting with others; (c) work slower due to lack of focus and motivation and anticipated difficulty with multi-step job tasks or multitasking; (d) suffer from increased stress and resulting performance issues due to mental health issues.  (Tr. 799-804)  The ALJ found Dr. Gruenfeld's opinion unpersuasive because it was not supported by Dr. Gruenfeld's own exam findings or the record as a whole.   (Tr. 39)  The ALJ also stated "there is evidence elsewhere in the treatment record of improved mental functioning with conservative treatment."  (Tr. 40)  Mattingly argues that the ALJ's opinion failed to build an accurate and logical bridge between the evidence and result. (Doc. No. 6 at 13)  In particular, Mattingly asserts that the ALJ did not explain how Dr. Gruenfeld's opinion lacked consistency with (a) Gruenfeld's treatment notes or (b) the record as a whole.

### Gruenfeld's Treatment Notes

Mattingly asserts that Dr. Gruenfeld's examination supports his opinion supported because Mattingly showed clear signs of anxiety during the examination which supported Gruenfeld's opinion. Doc. No. 6 at 13-14.  While Mattingly's anxious presentation adds some support to Gruenfeld's findings, the ALJ found several parts of the exam did not lend support to Dr. Gruenfeld's opinion including notes that Mattingly did not exhibit abnormal thoughts, remained on topic, and expressed that she managed her anxiety with marijuana.  (Tr. 34)  Although Gruenfeld opined that Mattingly would struggle to understand, remember, or apply information, the examination notes state that Mattingly did not exhibit any deficits in mental function noting that Mattingly could recall four digits forward and backward; recall three of three objects after a 10-minute delay; and maintain good concentration completing serial sevens from 100 to 79. (Tr. 34, 802)  Thus, the ALJ explained why the exam did not support Gruenfeld's opinion and that explanation was supported by substantial evidence in the record.

### Other Evidence in the Record

15

The ALJ also gave lesser weight to Dr. Gruenfeld's opinion because of its inconsistency with other evidence in the record.  First, the ALJ noted that Mattingly's anxious presentation at the April 2019 examination with Dr. Gruenfeld was not seen at other examinations with consultative examiners or medical providers.  (Tr. 22-24, 40)  The ALJ also found that although Mattingly told Gruenfeld that her mental health had a negative impact on past job performance, that information was not consistent with other information the record.  (Tr. 39, 777)  Mattingly reported being firing from one job, but stated it was due to asking for more money and coming in late one day.  (Id.)  The ALJ found that past consultative examinations and treatment notes were also inconsistent with Mattingly's report to Dr. Gruenfeld of doing no housework and not managing money/bills.  (Tr. 39)  And the ALJ noted that Mattingly's mental functioning improved with conservative treatment. In particular, Mattingly's was making good progress with therapy; she reported enjoying working with her co-workers; she had received several job offer and chose the part-time cashier position; at the time she discontinued therapy she had been enjoying her job and saved up for a car.  (Tr. 40)   Thus, the ALJ explained how Dr. Gruenfeld's opinion lacked consistency with other evidence in the record and that explanation was supported by substantial evidence.

Mattingly takes issue with the ALJ's statement that Mattingly did not engage in treatment and cancelled therapy sessions for reasons unrelated to Mattingly's mental health.  Mattingly asserts that the ALJ is cherry picking evidence and ignores evidence painting a more severe picture of her limitations. Matting states:

> For example, more recent evidence from Appleseed Community Mental Health Center had unsuccessfully discharged Plaintiff on July 19, 2017 after becoming inconsistent with attending appointments despite being responsive to treatment. T 1057. She was reported to have frequent contact with her counselor until May of 2017, which she did not reengage in services. T 1056. As the ALJ herself states, but nonetheless fails to reconcile her own findings with her assessment of Dr. Gruenfeld's opinion, Plaintiff did not continue engagement with psychiatric treatment until she was admitted to psychiatric hospitalization in September 9, 2019 after a disputed incident in which Plaintiff was reported to barricade herself in a room with an unloaded firearm while crying. T 843, 880, 911. Plaintiff's hospitalization initiated further referrals to mental treatment upon which Plaintiff had engaged. T 808-823, 830-842.

16

The evidence Mattingly's cites does not negate the ALJ's finding that Mattingly failed to engage in treatment and when she did her mental health conditions appeared to improve.  Further, the ALJ did not ignore Mattingly's September 2019 ER visit and psychiatric hospitalization.  As the ALJ noted, Mattingly maintained that she had not made threats to harm herself or others and asserts that her mother and son lied to the police and there was "no reason" for her psychiatric admission. (Tr. 34, 830, 836, 843)  The ALJ also addressed the fact that Mattingly participated in counseling during the time of the ER incident and the following month.  (Tr. 34-35)  However, as the ALJ noted, Mattingly reported everything was fine and reported missing appointments for transportation reasons.  (Tr. 34, 860)  Further, Mattingly did not seek mental health treatment between mid-2017 and mid-2019 or after the fall of 2019, despite seeking treatment for her physical disorders throughout that period.

The ALJ properly considered Mattingly's non-compliance and Mattingly has not shown that her non-compliance was linked to her mental health impairment.  An impairment that can be controlled by treatment is not disabling, regardless of Plaintiff's failure to seek treatment. *See Houston v. Sec'y of HHS*, 736 F.2d 365, 367 (6th Cir. 1984); *Eddy v. Comm'r of Soc. Sec*, 506 F. App'x 508, 509 (6th Cir. 2012) (ALJ properly considered that treatment had stabilized or improved a claimant's condition); *see also Strong v. Social Security Admin.,* 88 F. App'x 841, 846 (6th Cir. 2004) ("In the ordinary course, when a claimant alleges pain so severe as to be disabling, there is a reasonable expectation that the claimant will seek examination or treatment. A failure to do so may cast doubt on a claimant's assertions of disabling pain."). Moreover, Mattingly has not pointed to any evidence in the record, demonstrating that Mattingly's mental health limitations caused her to not engage with treatment. *See Borden v. Comm'r of Soc. Sec.*, No. 5:20-CV-1391, 2021 WL 3492105, at *15 (N.D. Ohio Aug. 9, 2021) (Plaintiff failed to demonstrate that the record contains "evidence expressly linking [her] noncompliance with [her] severe mental impairment."; *Yanich v. Comm'r of Soc. Sec. Admin.*, No. 1:18-CV-1633, 2019 WL 2395617, at *15 (N.D. Ohio June 6, 2019) (rejecting plaintiff's contention that her mental impairments caused her noncompliance with treatment where plaintiff failed to identity which mental disorder caused noncompliance); *Jontell Riddle*

17

*Banks v. Comm'r of Soc. Sec.*, No. 1:16-CV-2571, 2017 WL 4334114, at \*10 (N.D. Ohio Sept. 5, 2017), *report and recommendation adopted by* 2017 WL 4310665 (N.D. Ohio Sept. 27, 2017) (rejecting plaintiff's contention that his noncompliance was a symptom of his mental impairments where no provider opined that his impairments caused noncompliance).

Based on all of the above, Mattingly's argument that the ALJ "cherry-picked" evidence to discount Dr. Gruenfeld's opinion is not persuasive.

Mattingly also finds error with the ALJ stating that Mattingly's ability to engage in romantic relationships, obtain several employment offers, and work part time contradicted Dr. Gruenwald's severe limitations.  Doc. No. 6 at 15-19.  Mattingly asserts, "the ALJ provides no explanation as the fact that Plaintiff had engaged in romantic relationships is inconsistent with Dr. Gruenfeld's opinion that Plaintiff would have significant problems working with others in a work-setting due to her apparent anxious behaviors."  Id.   The ALJ did not state that Mattingly's ability to engage in romantic relationships by itself demonstrated inconsistency with Gruenfeld's opinion about working with others.  The ALJ pointed to Mattingly's romantic relationships, ability to obtain and maintain employment, her reported enjoyment of her job, and her good relationships with coworkers.  (Tr. 40)  Earlier in the decision, where the ALJ finds moderate limitations in Mattingly's ability to work with others, the ALJ also points to many other pieces of evidence that, taken as a whole, conflict with severe limitations on her ability to interact with others including: Mattingly having a good relationship with her sister; visiting with family and friends; traveling out of state; stating she loved her job as a cashier (a job that involves significant public interaction).  (Tr. 23-24)  The ALJ also pointed to numerous medical and consultative examinations where Mattingly demonstrated no interaction deficits with practitioners.  (Tr. 23-24)  The ALJ found Mattingly had moderate limitations in her ability to interact with others based on treatment records that demonstrated exams with some deficit of mood including tearfulness.  (Tr. 23)  Thus, the ALJ built an accurate and logical bridge as to why he discounted Gruenfeld's severe interactional limitations.

18

Based on all of the above, the ALJ's decision is supported by substantial evidence and does not fail to build an accurate and logical bridge as to why the ALJ discounted Gruenfeld's opinion.  Mattingly's arguments to the contrary are unavailing.

### 3.    Dr. Thomas & Dr. Gatton

Mattingly also asserts the ALJ erred in her consideration of the opinions of consultative examiners Christopher Thomas, D.O.,[2] and James Gatton, M.D.  Both doctors completed disability evaluations regarding Mattingly's physical impairments – Dr. Gatton on December 15, 2018, (Tr. 783-90) and Dr. Thomas on April 19, 2019.  (Tr. 792-98)   Dr. Thomas and Dr. Gatton opined Mattingly has the following physical limitations:[3]

|  | Dr. Thomas | Dr. Gatton |
|---|---|---|
| Walking | 2 hours | 3-4 hours |
| Standing | 2 hours | 4-5 hours |
| Carrying | 10lbs frequently | <5lbs frequently |
|  | >10lbs occasionally | >10lbs occasionally |

(Tr. 798 – Thomas)  In addition to the above, Drs. Thomas and Gatton opined Mattingly would be limited in lifting, carrying, pushing and pulling, overhead and forward reaching.  (Tr. 789, 798)  Dr. Thomas further opined Mattingly would be limited in climbing, stooping, bending, crawling, kneeling, and crouching.  (Tr. 798)  Dr. Gatton also opined Mattingly had diminished fine motors, such as gripping, with her left hand.  (Tr. 789)  The ALJ found both opinions unpersuasive because they were inconsistent with their respective exam findings and the record as a whole.  (Tr. 40)  Mattingly asserts that the ALJ cherry picked evidence in the record and did not provide a sufficient explanation to support for her determination.  (Doc. No. 6 at 17-24)  Mattingly's argument is without merit.

---

[2] The ALJ's decision incorrectly identifies Dr. Christopher Thomas as Kenneth Thompson.  The Commissioner notes that this is a typographical error.  Both Plaintiff and the Commissioner  refer to the consultative examiner as Dr. Thomas.
[3] Both opinions base Mattingly's limitations on an eight-hour workday.

As to the ALJ finding that Dr. Thomas and Dr. Gatton's opinions were unsupported by their own examinations, the ALJ did not cherry pick evidence or fail to provide a sufficient explanation for this determination.  The ALJ acknowledged Mattingly's self-reports and minor deficits in Dr. Thomas's 2019 exam, but also notes that Mattingly could heel/toe walk and squat; had normal bulk and tone for all major muscle groups; had gross grip strength of 5/5 on both sides; had a fine fingering deficit of the left arm due to an arm brace; and was neurologically intact, including sensation and reflexes.  (Tr. 29)  Thus, the ALJ explained how, while Dr. Thomas's exam supported some deficits, it did not support the severity of the limitations opined.  (Tr. 29)  Mattingly's argument related to Dr. Gatton fails for similar reasons. Again, the ALJ noted minor deficits in Mattingly's 2018 exam with Dr. Gatton, but also points out that she could heel-to walk, hop, squat; had normal coordination, sensation, and reflexes; could engage in fine fingering on both sides; and had full grip strength on the right and slightly reduced (4/5) grip strength on the left.  (Tr. 29)  Thus, the ALJ's decision does not demonstrate cherry-picking and the ALJ provided sufficient explanation as to why she felt Dr. Gatton and Thomas's did not provide support the severity of limitations he opined.

As Mattingly notes, the ALJ also discounted Thomas's and Gatton's opinion due to their inconsistency with the record as a whole.  Mattingly again asserts that the ALJ failed to provide a sufficient explanation and claims that the ALJ "cherry-picked" evidence.  (Doc. No. 6 at 19-20)

Mattingly argues that the ALJ ignored treatment records containing her self-reported symptoms. (Tr. 695, 710, 714, 716, 1070, 1077, 1359).  The ALJ acknowledged Mattingly's complaints but stated the symptoms "appear to be quite dramatic and exaggerated, given minimal objective findings and minimal deficits on clinical diagnostic testing."  (Tr. 35)  The ALJ also pointed to several contradictions in the record.  Where an ALJ finds subjective reports "unworthy of complete belief, any medical opinion based on such complaints may also be discounted." *Lunsford v. Astrue*, 2012 WL 1309265 at *5 (S.D. Ohio April 16, 2012) (citing *Allen v. Commr. of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009).  On review the Court

must accord great weight to an ALJ's credibility determination and is "limited to evaluating whether or not the ALJ's explanations… are reasonable and supported by substantial evidence in the record." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir.2003) (citations omitted).   Here, the ALJ's credibility determination was reasonable and supported by substantial evidence in the record.  Thus, the ALJ was entitled to discount medical opinions based on Mattingly's subjective complaints.

Mattingly also suggests the ALJ ignored the following evidence:  (a) evidence she wore an arm brace; (b) a 2016 MRI, and (c) a few treatment notes from 2017 and 2020 that report pain, guarding, and limitations of movement.  (Doc. No. 6 at 23-24)

First, the ALJ did not ignore evidence Mattingly used an arm brace.  (See e.g., Tr. 29)  The ALJ acknowledges Mattingly's occasional arm brace usage but noted several occasions where she did not wear the arm brace and pointed to many treatment notes that showed no deficit in the use of her arm.  The Sixth Circuit has held that assistive devices must be "necessary" to be considered a limitation on a plaintiff's ability to work.  *Murphy v. Astrue*, 2013 WL 829316, at *10 (M.D. Tenn. March 6, 2013) (*citing Carreon v. Massanari*, 51 Fed. App'x 571, 575 (6th Cir. 2002)).  A device is considered "necessary" when the record reflects "more than just a subjective desire on the part of the plaintiff" to use it.  Id.  Here, the ALJ did not find the arm brace necessary, and Mattingly fails to point to any evidence that contradicts the ALJ's finding.

Mattingly argues that the ALJ also ignored other evidence including a May 2016 MRI showing disc protrusion (Ex. 2F, Tr. 580-81, 603-04); an April 2017 examination reporting mild limitation in side-to-side neck turning (Ex. 8F, Tr. 712);  a May 2020 visit that noted pain and guarding during the examination (Tr. 1324); and a July 2020 visit that noted tenderness and increased pain with upward extension and limited flexion (28F, Tr. 1359).  The ALJ did not ignore this evidence.  The ALJ discussed the 2016, as well as a 2020, MRI.  The ALJ's decision also contains a detailed analysis of complaints or deficits reported in Mattingly's examinations, including reports of tenderness, pain, and limitations.  However, the ALJ pointed

to other substantial evidence in the record showing no or limited deficits in Mattingly's physical functioning. For example, the ALJ pointed to the fact that doctors prescribed only conservative treatments; Mattingly lacked follow through on care and how Mattingly went through periods without any treatment; and how with treatment Mattingly experienced some symptom improvement. (Tr. 27-31, 35-41) The ALJ also noted that despite some tenderness and limited range of motion, examinations by neurological and spine surgeons in May and July 2020 found full strength and sensation, normal gait, 5/5 upper extremity muscle strength. In fact, the ALJ noted that Dr. Gatton's finding of reduced grip strength was not noted in other exams with consultative and treating specialists (Tr. 40, 783, 1324-26, 1359-60). The ALJ also noted that a July 2020 EMG and NCS were negative for "any evidence of conditions that would reasonably affect hand or manipulative function." (Tr. 40) In particular, EMG and NCS testing was within normal limits, revealing no evidence of radiculopathy; carpal tunnel; or neuropathy. (Tr. 30, 1346) The ALJ did not ignore evidence and explained how she concluded that the opinions of Drs. Thomas and Gatton were "consistent with essentially sedentary work, [which] do not comport with the overall findings of treating providers and, thus, the conclusions as a result of these single examinations are less persuasive." (Tr. 40)

Based on all of the above, the ALJ did not err in her consideration of the opinions of Dr. Gatton or Dr. Thomas.

### 4. N.P. Harpster

Finally, Mattingly argues that the ALJ erred in her consideration of CNP Melinda Harpster's 2016 opinion. Harpster opined that Mattingly's physical limitations restricted her from lifting more than ten pounds and required Mattingly to keep her neck in the neutral position. (Tr. 430) The ALJ found Harpster's opinion unpersuasive. (Tr. 41) Mattingly asserts that decision is not supported by substantial evidence.

First, the ALJ found Nurse Harpster's examination did not support her opinion because it was based on Mattingly's self-reported symptoms, not objective or diagnostic testing.  (Tr. 27)  The ALJ noted that Mattingly's exam appeared to have yielded "completely normal [results] including gait, strength, range of motion, cranial nerves and without tenderness."   (Tr. 41)  The ALJ also notes that Harpster's opinion was rendered prior to substantial updates in the medical evidence including consults with neurology and spinal surgeons.  (Id.)  Based on all of the above, the ALJ provided sufficient explanation for why he discounted Nurse Harpster's opinion and that explanation is supported by substantial evidence in the record.

Mattingly also takes issue with the ALJ noting Harpster's opinion was less persuasive between it was "the first day she saw claimant," but that argument is unpersuasive.  (Doc. No. 6 at 25)  The ALJ included the lack of frequency as one of several reasons why he discounted Harpster's opinion. Second, although Mattingly is correct that the SSA's 2017 regulation update changed how the ALJ's reviewed treating source opinions, Mattingly is incorrect in arguing that the ALJ can no longer consider frequency of a visit a factor.  20 C.F.R. § 404.1520c(i) specifically states that one of the factors in considering medical opinions is "Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s)."   Accordingly, the ALJ did no err in her consideration of Nurse Harpster's opinion.

**B.    Summation**

For all of the reasons detailed above, Mattingly fails to support her arguments that the ALJ "cherry-picked" evidence and provided insufficient explanations for discounting the opinions of Drs. Gruenfeld, Thomas, Gatton, and Nurse Harpster.  As noted by the Sixth Circuit, the so-called cherry picking of evidence by the ALJ "can be described more neutrally as weighing the evidence." *White v.*

*Comm'r of Soc. Sec.,* 572 F.3d 272, 284 (6th Cir.2009). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir.2001) (citation omitted). "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* at 773 (citations omitted).  Here, the ALJ built an accurate and logical bridge as to why she discounted the medical opinions of Gruenfeld, Thomas, Gatton, and Harpster.  The ALJ did not overlook evidence and supported her explanation with substantial evidence in the record.  As such, the ALJ did not err.

## CONCLUSION

For all of the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Dated:  December 12, 2022                  *s/ Jonathan Greenberg*
                                                          Jonathan D. Greenberg
                                                          United States Magistrate Judge